# Staunton.

## BELL V. COMMONWEALTH.

### September 17th, 1891.

1. CRIMINAL PROCEEDINGS—*Rule under § 3484.*—Where the evidence (not the facts) is certified, this court must admit the truth of all the exceptee's evidence and all just inferences therefrom, and reject all the exceptor's parol evidence in conflict therewith, and cannot disturb the verdict unless it appears to be, when so considered, plainly wrong.

2. IDEM—*Attempts to poison—Case at bar.*—Husband and wife had long been at enmity. He had threatened to kill her. He was enamored of another woman. On day of the alleged crime he and his children were dining. She was out, but returning went into the sitting-room where children soon followed, leaving him alone at table. She came to dinner. He handed her bread. She took gravy, but at first mouthful cried out: "This is awful bitter," and spit it out. Children being asked what was the matter with the gravy, said: "Nothing; we all ate of it," but tasting it again, said it was bitter. They gave it to the dog. Wife complaining of the effects, children sent for a doctor who gave her sweet milk. Husband said: "If milk be good for her, give me some for the dog." The dog soon died. The doctor found in wife some symptoms of strychnine poison. No analysis was made of the gravy or anything else. Husband made no explanation. At the trial of husband for attempt to poison, the jury found him guilty ;

HELD :

The verdict could not be disturbed.

Error to judgment of circuit court of Rockingham county, rendered April 18th, 1891, affirming a judgment of the county court of said county, rendered March 25th, 1891, whereby the plaintiff in error, James F. Bell, was sentenced to confinement in the state penitentiary for a period of three years, in accord-

ance with the verdict of the jury on trial of an indictment against him for an attempt to commit murder of his wife by poison. Opinion states the case.

*O. B. Roller*, and *W. L. Yancey*, for plaintiff in error.

*Attorney-General R Taylor Scott*, for commonwealth.

LACY, J., delivered the opinion of the court.

The only assignment of error is that the trial court erred in overruling the prisoner's motion for a new trial, on the ground that the verdict of the jury was contrary to the law and the evidence.

The evidence certified is that the plaintiff in error and his wife had been married nineteen years and had four children, in ages from seventeen to five years; that for six years all marital relations had been abandoned; that they had long been at enmity, and that he had, at one time, abandoned his family altogether, and had removed into his present abode, where he had remained without them for about one year, when the family had come to him, and he had rented the house, and they lived with him.

The evidence shows that the plaintiff in error was a hard-working day-laborer without a trade, and that he devoted his wages as such to the support of his family. But a mutual antipathy existed between the two, the wife sometimes speaking of leaving her husband altogether, and the husband charging his wife with unchastity, which greatly offended her, and, it seems, gave some currency to injurious reports concerning her, he often, and to various witnesses, announcing his purpose to get rid of her in some way so that he could be a happier man.

His son, grown to be seventeen years old, and a stout laborer, worked out on his own account, and his wages became a new

element of disturbance in the family, his father claiming the right to collect them, and his son denying it.

About this time the husband and father became enamored of a young woman in the neighborhood, so much so that he said he intended to get rid of *her*—not calling his wife's name : that he loved the ground on which the new inamorata walked.

On the 13th day of December, 1890, the following incidents occurred in this family :

The wife was absent from home, and dinner had been prepared by the daughter, fourteen years of age. The husband and father and the other three children were called to dinner at the usual hour by the daughter, and while they were at dinner the wife, who had been to the house of a neighbor to borrow a pattern to make some garment for the eldest son, returned and passed through the dining-room or kitchen into the adjoining room, and returned and procured a smoothing iron from the stove, and went back into the sitting-room adjoining, and proceeded to smooth out the wrinkles in the pattern ; and when the eldest son finished eating his dinner he came into the room, and the mother was trying the pattern on him when the other children finished their dinner and came out of the dining-room, leaving the father still eating his dinner sitting at the table. When the wife came in to get her dinner, and took her seat at the table, the plaintiff in error got up and went to the stove and brought some bread therefrom and handed it to his wife, and seated himself at the stove and put his feet inside, with his back to his wife. She took some gravy out of a bowl on the table, and mixed some cornbread with it, and proceeded to eat. With the first mouthful she hallooed out : " This is awful bitter ! " and ran to the door and spit out what she had in her mouth, and called out to her children to know what was the matter with the gravy. They replied : " Nothing " .; that they had all eaten of it at dinner. The mother tasted it again, and again spit it out, and, taking up the bowl of gravy, carried it towards the sitting-room, and her son met her, and perceiv-

ing a lot of white particles in it, took off a white speck with a lead pencil and tasted it, and said it was bitter, and one of the other children tasted, with a like result; and the son said: " Give it to the dog," which they did; and the mother feeling a stiffening of the jaws and jerking of the limbs, and a cramp in her fingers, and a burning in her stomach, became alarmed, and they sent for the doctor, who gave her some sweet milk as an antidote. And the plaintiff in error who had taken no part up to this time in what was going on, said: " If sweet milk is good for her, give me some to give the dog "—the dog at the time manifesting symptoms of great suffering; the dog died shortly—in about twenty minutes. The doctor came and found the wife suffering with some of the symptoms of strychnine poison, caused by the absorption through the mucous membrane of the mouth, none having been swallowed. He thought her case not very serious, the burning in the stomach being no symptoms of strychnine poison, though the others were; gave her the best antidote he had, not saying what it was; inserted morphine after awhile and she became quiet. No analysis was made of the stomach of the dog, nor of the remnant of the gravy and bread bottled up and sealed by the doctor. And the accused, when questioned about this poison, said he could not have gotten it from a store without giving his name, and having that and the quantity and the date recorded; and gave no other explanation as to where the poison came from, or who put it in the gravy.

After he and the children had eaten, and while he was alone in the room before his wife came in—he was in this room all the time, and no one else came in—the door between the dining-room and sitting-room was all the time open, so that persons passed through without disturbing it. It is clear that poison was put into this gravy while he sat alone at the table on which it was sitting; that no other person was in the room, and no other person had the opportunity to place the poison until his wife came in. He certainly had the opportunity, and he is

proved to have had a motive to destroy his wife. He had indulged, to persons with whom he talked, in threats to that end ; and his actions at the time—handing his wife the bread, notwithstanding their bad relations—and then seating himself *with his back to her*, sticking his feet in the *oven of the store*, still hot, while he had been in the house a considerable time. His posture was one of waiting and expectancy, and the act of putting his feet in the warm oven of the stove was doubtless suggested by that chilliness of the extremities incident to his surroundings. His conduct afterwards was suspicious. He said he could not have gotten the poison without giving his name, etc. Under what circumstances had he found this out ? When he saw what was supposed to be an antidote for his wife he asked for some for the dog. He doubtless was fully impressed with the deadly character of the white powder in the gravy. . He was tried by a jury of his neighbors and former friends and associates. He was ably defended by skillful counsel. His steady habits and general good character was spread before the jury and trial court by a host of good men, who cheerfully so testified ; and upon their oaths the jurors have passed between him and the commonwealth, and have found him guilty of attempting to poison his wife. In mercy they have fixed the period of his incarceration at three years, the shortest time allotted under the law. The trial judge has heard all the testimony, and has refused to disturb the verdict so found.

We must, under our law, consider the case as upon a demurrer to evidence—that is, we must admit the truth of the commonwealth's evidence and all just inferences flowing therefrom, and reject all the *parol* evidence of the accused in conflict therewith, and we cannot disturb the verdict unless it appears to be, when thus considered, plainly wrong.

We cannot say that this conviction was without evidence or against the evidence ; it appears to be warranted by the evidence.

There is no reasonable hypothesis consistent with his inno-
cence. The contention of the counsel of the plaintiff in error
that it was possible for the wife to have dropped this poison out
of her sleeve, in order to poison herself to get her husband in
the penitentiary and so get rid of him, is unreasonable and
unsupported by any evidence in the case to any degree what-
ever.

We perceive no error in the judgment appealed from, and
the same must be affirmed.

JUDGMENT AFFIRMED.